UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DENNIS HAGER, individually and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>METRO ONE LOSS PREVENTION SERVICES GROUP, INC., a Maryland corporation; METRO ONE LOSS PREVENTION SERVICES GROUP (WEST COAST), INC., AND METRO ONE LOSS PREVENTION SERVICES GROUP (GUARDS), INC.,<br><br>Defendants. | CASE NO. 3:25-cv-05164-JHC<br><br>ORDER |

# I

## INTRODUCTION

This matter comes before the Court on Plaintiff Dennis Hager's Motion to Remand. Dkt. # 14. The Court has considered the materials filed in support of and in opposition to the motion, the rest of the file, and the governing law. The Court finds oral argument unnecessary. Being fully advised, for the reasons below, the Court DENIES the motion.

ORDER - 1

## II

### BACKGROUND

Defendants provide security and loss prevention services to customers across the corporate sector. Dkt. # 1-1 at 4 ¶ 3.7.[1] Hager began working for Defendants in March 2023 as an Account Manager and was promoted to Regional Performance Manager in January 2024. *Id.* at 5 ¶ 5.3.[2] Hager alleges that Defendants required him to sign a "Confidentiality and Noncompetition Agreement," (the Agreement) containing a non-disparagement clause and a noncompetition covenant as part of his employment. *Id.* at 5–6 ¶¶ 5.4–5.5. The non-disparagement clause requires Hager to refrain from "directly or indirectly, through any agent or surrogate, or in any way otherwise, orally or in writing, either while employed by the Company, or at anytime thereafter, disparage or denigrate the Company." *Id.* at 5 ¶ 5.4. The noncompetition covenant prohibits Hager, for two years after his employment ends, from

> within a twenty-five (25) mile radius of any location at which the Company maintains or conducts any busines [*sic*]), operations or facility: (a) start[ing], continu[ing], advis[ing], assist[ing], or in any way otherwise participat[ing] or engag[ing] in any competing business; or (b) seek[ing] or accept[ing] any employment or other affiliation, in any capacity, with any then or thereafter known competitor of the Company which maintains any business, operations or facility.

*Id.* at 6 ¶ 5.5.

Hager filed this putative class action against Defendants in state court, alleging that the Agreement violated Washington's Noncompete Act (NCA), RCW 49.62 and Washington's Silenced No More Act (SNMA), RCW 49.44.211. *Id.* at 2–3 ¶¶ 1.1.–1.2. He asserts that he is entitled to statutory damages and requests an injunction preventing Defendants from enforcing the clauses. *Id.* at 10–11 ¶¶ 7.4, 8.5. Defendants removed the case to this Court. Dkt. # 1. They

---

[1] The information in this section derives from Hager's Complaint. *See generally* Dkt. # 1-1.
[2] The Complaint describes Hager as a "former employee" of Defendants but does not say when his employment with Defendants ended. Dkt. # 1-1 at 4–5 ¶¶ 3.8, 5.3.

say that this Court has jurisdiction over this matter under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Dkt. # 1 at 2.  Hager then filed the present motion requesting that the Court remand this matter to state court because the Court lacks subject matter jurisdiction over his claims.  Dkt. # 14.  Specifically, Hager contends that he lacks Article III standing because his "injury is not concrete and particularized."  Dkt. # 14 at 7.

## III

### DISCUSSION

Standing under Article III of the United States Constitution is a component of subject matter jurisdiction.  *Chandler v. State Farm Mut. Auto. Ins.*, 598 F.3d 1115, 1121 (9th Cir. 2010).  It is a "threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Article III standing requires that a plaintiff (1) "suffered an injury in fact[,]" (2) that there was a "causal connection between the injury and the conduct complained of[,]" and (3) the injury is likely "redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted).  A plaintiff must have standing for each claim and form of relief sought.  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).  And "state law can create interests that support standing in federal courts." *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001) ("If that were not so, there would not be Article III standing in most diversity cases, including run-of-the-mill contract and property disputes.").

At issue is the first element, injury-in-fact.  An injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Montana Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1188 (9th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Srvs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).  The injury must also be "fairly

ORDER - 3

traceable to the challenged action of the defendant" and "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quoting *Friends of the Earth*, 528 U.S. at 180–81). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). A plaintiff cannot "for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at 341. This requirement applies to class actions. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 437 (2021).

An injury is "concrete" for standing purposes if it is "*de facto*; that is, it must actually exist," meaning that the injury is "real and not abstract." *Spokeo*, 578 U.S. at 340. But "'[c]oncrete' is not, however, necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize, [the Supreme Court has] confirmed in many . . . previous cases that intangible injuries can nevertheless be concrete." *Id.* "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425. When faced with "an intangible harm that is linked to a statutory violation," courts "are guided in determining concreteness by both history and the judgment of Congress, or the legislature that enacted the statute." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1116 (9th Cir. 2020) (internal quotation omitted). "When a legislature has enacted a 'bare *procedural*' protection, a plaintiff 'cannot satisfy the demands of Article III' by pointing only to a violation of that provision, but also must link it to a concrete harm." *Id.* at 1117 (emphasis in original) (quoting *Spokeo*, 578 U.S. at 342). "When, however, a statutory provision identifies a *substantive* right that is infringed any time it is violated, a plaintiff bringing a claim under that provision 'need not allege any further harm to have standing.'" *Id.* (emphasis in original) (quoting *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983–94 (9th Cir. 2017)).

A.      Injury Under Washington's NCA

Generally, Washington's NCA prohibits employers from imposing noncompetition covenants on employees who earn less than $100,000 annually. RCW 49.62.020 (1)(b). Under the NCA, a noncompetition covenant "includes every written or oral covenant, agreement, or contract by which an employee or independent contractor is prohibited or restrained from engaging in a lawful profession, trade, or business of any kind." RCW 49.62. 010. It "also includes an agreement that directly or indirectly prohibits the acceptance or transaction of business with a customer." *Id.* In enacting the NCA, the Legislature noted that "[w]orkforce mobility is important to economic growth and development" and that the NCA "facilitat[es] workforce mobility and protect[s] employees and independent contractors." RCW 49.62.005.

Hager contends that this matter should be remanded because the Complaint does not even allege a hypothetical injury due to Defendants' violation of the NCA. Dkt. # 14 at 9. He says that "technical and procedural violations of the NCA" do not confer Article III standing absent a plaintiff pleading facts that the noncompetition covenant at issue caused a particularized and concrete injury. Dkt. # 19 at 10.

Defendants respond that the NCA "protects the concrete interest of preventing contracts of adhesion and restraints on employee mobility, particularly with respect to low-wage employees." Dkt. # 17 at 21. They say that this concrete interest is violated the moment an employee is bound by an unlawful noncompetition covenant in an employment contract. *Id.* They also contend that the NCA's prohibition on noncompetition covenants implicates contract rights—a harm traditionally protected under common law. *Id.* at 22 (citations omitted).

Hager has a tangible interest in preventing the noncompetition covenant from being enforced against him. As a former employee of Defendants, he alleges that Defendants violated the NCA by "requir[ing]" him to sign an employment contract containing a noncompetition

ORDER - 5

covenant. Dkt. # 1-1 at 6 ¶ 5.5. He requests that a court award statutory damages and enjoin Defendants from enforcing the noncompetition covenant against him. *Id.* at 11. Based on the terms of the agreement, his workplace mobility is restricted for two years after his employment ends.³ *Cf. Couch v. Morgan Stanley & Co.*, No. 1:14-CV-0010 LJO JLT, 2014 WL 1577463, at *7 (E.D. Cal. Apr. 18, 2014) ("[B]ecause the Non–Compete Clause has expired and poses no threat of future harm, Mr. Couch lacks Article III standing to pursue his fourth cause of action.").

And the Washington Legislature has said that "workforce mobility is important to economic growth and development" and the NCA "facilitat[es] workforce mobility and protect[s] employees." RCW 49.62.005; *see Univ. Ins., LLC v. Allstate Ins. Co.*, 564 F. Supp. 3d 934, 942 (W.D. Wash. 2021) ("The purpose of the [NCA] is to promote "workforce mobility" and to curb "agreements limiting competition or hiring." . . . Thus, given the legislature's intent, the "restraints" targeted by the noncompetition statute are generally those that stifle "workforce mobility" or "competition" and "hiring").

Furthermore, the alleged injury to Hager—the inclusion of a noncompetition covenant in his employment contract—implicates contract rights. This is a harm traditionally recognized as providing a basis for lawsuits in American courts. *See TransUnion LLC*, 594 U.S. at 413; *cf. Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 571 (S.D.N.Y. 2024) ("History and precedent support that a person whose contractual rights have been violated has standing to sue the breaching party, regardless of whether the non-breaching party has suffered additional harm. . . A breach of contract always creates a right of action; but a breach sometimes

---

³ Although Hager does not specify when his employment ended in the Complaint, he does mention a promotion in January 2024. Dkt. # 1-1 at 5 ¶ 5.4. Thus, Hager is still within the two-year term of the noncompetition covenant.

ORDER - 6

occurs without causing any harm.") (quotation and citation omitted); *see also Spokeo*, 578 U.S at 343 (Thomas, J., concurring).

And the case Hager relies on to support his argument is distinguishable. In *Rutter v. Bright Horizons Family Solutions Inc.*, No. C23-0233-KKE, 2024 WL 278928, at *1 (W.D. Wash. Jan. 25, 2024), plaintiff Rutter, a teacher at Bright Horizons, alleged that Bright Horizons violated the NCA based on an enrollment agreement between Bright Horizons and its customers. *Id.* The enrollment agreement stated that if a client family hired a former Bright Horizons employee within six months of the employee's departure from Bright Horizons, the family would have to pay a $5,000 placement fee. *Id.* The court, in resolving Bright Horizons' motion to dismiss, determined that Rutter lacked Article III standing because she did not allege a concrete, non-hypothetical injury. *Id.* at *2. As the court noted, the enrollment agreement was "between Bright Horizons and its customers" and was not a provision "in any employment agreement with Rutter." *Id.* The court also observed that "no Washington court has determined whether [the NCA] encompasses agreements that merely impact employees in some way, as opposed to agreements *with* employees that restrict their workplace mobility." *Id.* (emphasis in original) Ultimately, the court's analysis turned on the fact that Rutter's alleged injuries were "entirely hypothetical," because the Complaint alleged that "Bright Horizons client families would '*likely*' not be able to hire her because of the placement fee provision." *Id.* (emphasis added). Here, unlike in *Rutter*, Hager alleges a concrete injury: as an employee he was required to sign an employment contract with Defendants containing a noncompetition covenant restraining his employment mobility for two years after his employment ends.

The decisions of other courts in this District regarding Washington's Equal Pay and Opportunities Act (EPOA) are also distinguishable. The EPOA requires employers to "disclose in each posting for each job opening the wage scale or salary range, and a general description of

ORDER - 7

all of the benefits and other compensation to be offered to the hired applicant." RCW 49.58.110. In *Partridge v. Heartland Express Inc. of Iowa*, No. 3:24-CV-05486-DGE, 2024 WL 4164245 (W.D. Wash. Sept. 12, 2024), the court determined that Partridge did not have Article III standing because he merely alleged that the defendant posted a job opening without a listed salary range and he "lost valuable time" in applying for the position. *Id.* at *4. As the court noted, Partridge did not contend that he was offered an interview for the position nor assert that "the deprivation of information compromised his bargaining power in pay negotiations, placed him at a disadvantage relative to other applicants, or resulted in him having to exit a lengthy interview process after learning the pay was insufficient for his needs." *Id.*; *see also Hill v. Spirit Halloween Superstores LLC*, No. C24-1644 TSZ, 2024 WL 5117460, at *1 (W.D. Wash. Dec. 16, 2024) (describing other cases in this district remanding EPOA cases because the plaintiffs lacked Article III standing).

Similarly, in *Atkinson v. Aaron's LLC*, 733 F. Supp. 3d 1056, 1070 (W.D. Wash. 2024), Atkinson applied online for a position with Aaron's that was posted on the company's website. *Id.* at 1063. Atkinson alleged that the job posting did not disclose the wage scale or salary range in violation of the EPOA. *Id.* The court, in ruling that Atkinson lacked Article III standing, stated that a "nominal [job] applicant with no interest in the position will neither receive a benefit from early pay disclosure nor be harmed by the lack thereof. There is no risk of harm to someone browsing job postings with no intent to apply or with intent only to find those that have no compensation included so they can go through the motion of applying and then sue for the technical violation." *Id.* at 1070.

Here, unlike the "nominal applicants" in the EPOA cases, Hager's injury is concrete or particularized. He alleges that he is currently bound by an unlawful noncompetition covenant

ORDER - 8

that restricts his employment mobility for two years.

B.      Injury under Washington's SNMA

The SNMA "[p]rohibit[s] nondisclosure and nondisparagement provisions in agreements concern[ing] conduct that occurs at the workplace, at work-related events coordinated by or through the employer, between employees, or between an employer and an employee, whether on or off the employment premises." RCW 49.44.211(1). In enacting the SNMA, the Legislature stated,

> Nondisclosure and nondisparagement provisions in agreements between employers and current, former, prospective employees, and independent contractors have become routine and perpetuate illegal conduct by silencing those who are victims or who have knowledge of illegal discrimination, illegal harassment, illegal retaliation, wage and hour violations, or sexual assault. It is the intent of the legislature to prohibit nondisclosure and non-disparagement provisions in agreements, which defeat the strong public policy in favor of disclosure.

*Id.* ("Official Notes").

Hager asserts that his contention that Defendants violated Washington's SNMA has no concrete injury. Dkt. # 14 at 9. He says that even though there is no precise case law on Article III standing under Washington's SNMA, the legislative language of the statute is instructive. *Id.* at 10 (quoting RCW 49.44.211(11) which states, "This subsection allows the recovery of damages only to prevent the enforcement of those provisions"). Hager contends that the SNMA provides a remedy absent any harm to a potential plaintiff.

Defendants counter that the SNMA codifies the concrete interest of allowing employees to speak freely about illegal acts in the workplace by prohibiting non-disclosure and non-disparagement provisions in employment contracts. Dkt. # 17 at 26. They say, "That interest is violated when an allegedly unlawful non-disparagement clause is included in an employment agreement." *Id.* at 27. They also say that Hager's claim under the SNMA is premised on a violation of his contract rights, a concept deeply rooted in the common law. *Id.* at 28.

ORDER - 9

Hager alleges that Defendants unlawfully "required" him to "execute" an employment contract containing a non-disparagement clause preventing him from making any "disaparag[ing] or denigrat[ing]" remarks about Defendants during and after his employment. Dkt. # 1-1 at 6 ¶ 5.5. Hager requests that a court award statutory damages and enjoin Defendants from enforcing the non-disparagement clause against him. *Id.* at 11.

Hager's SNMA claim derives from the alleged inclusion of an unlawful clause in his employment contract. As stated above, the alleged injury to Hager implicates contract rights. This is a harm traditionally recognized as providing a basis for lawsuits in American courts. *See TransUnion LLC*, 594 U.S. at 413; *see also Eletson Holdings, Inc.*, 731 F. Supp. 3d 531, 574 (S.D.N.Y. 2024) ("[C]ontract rights are a type of private right recognized as conferring Article III standing."); *cf. In re Google Referrer Header Priv. Litig.*, 465 F. Supp. 3d 999, 1011 (N.D. Cal. 2020) ("An individual to whom a contractual duty is owed may, therefore, allege a concrete legal injury by virtue of the duty's breach, apart from any actual damages stemming from that breach").

Moreover, although Hager contends that Defendants' alleged violation of the SNMA is "purely technical," Dkt # 14 at 11, the Washington Legislature in enacting the SNMA recognized the "strong public policy in favor of disclosure" and that non-disclosure and non-disparagement agreements have "become routine and perpetuate illegal conduct." RCW 49.44.211(1) ("Official Notes"). The Legislature was particularly concerned with the harm to employees "who are victims or who have knowledge of illegal discrimination, illegal harassment, illegal retaliation, wage and hour violations, or sexual assault." *Id.* This is reflected in the Legislature's decision to create a private right of action available when an employer includes a non-disclosure or non-disparagement provision in an employment contract. *See, e.g., Campbell*, 951 F.3d at 1117. Further, the non-disparagement clause at issue raises a material risk of harm because it impairs

ORDER - 10

an employee's ability to speak or write about Defendants, irrespective of the time that has passed since the employment ends. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1270 (9th Cir. 2019) ("The violation of a statutory right that protects against 'the risk of real harm' may be sufficient to constitute injury-in-fact.") (quoting *Spokeo*, 578 U.S. at 331); *see also Campbell*, 951 F.3d at 1117.[4]

## IV
### CONCLUSION

Based on the above, the Court DENIES the motion to remand the case to Pierce County Superior Court. The Court also DENIES Hager's request for attorney fees and costs. The Court DIRECTS the Clerk to issue a new order regarding initial disclosures, joint status report, and early settlement.

Dated this 28th day of May, 2025.

John H. Chun
United States District Judge

---

[4] Although no federal court has squarely dealt with whether a plaintiff has Article III standing under the SNMA, there are several ongoing cases proceeding in federal district courts involving SNMA claims. *See, e.g.*, *Onshore Quality Control Servs., LLC v. Bromley*, No. 4:24-CV-5134-RLP, 2025 WL 85323, at *2 (E.D. Wash. Jan. 13, 2025) (without addressing Article III standing, the court denied the defendant's 12(b)(1) motion to dismiss the complaint alleging five violations of the SNMA based on lack of diversity jurisdiction); *Aulakh v. Crane Worldwide Logistics, LLC*, No. 2:24-CV-01151-TLF, 2025 WL 405110, at *1 (W.D. Wash. Feb. 5, 2025) (permitting the plaintiff to amend her complaint to add an SNMA claim); *Empey v. Caliber Holdings LLC*, No. 3:23-CV-05170-RJB, 2024 WL 4494895, at *3 (W.D. Wash. Oct. 15, 2024) (in the context of a Rule(f) motion to strike, the court analyzed the interaction between the SNMA and Washington's Mediation Act); *Schreiber v. Catalyst Nutraceuticals, LLC*, No. 1:23-CV-373-MLB, 2024 WL 4245418, at *5 (N.D. Ga. Sept. 17, 2024) (declining to dismiss the plaintiff's SNMA claim at the summary-judgment stage).